# Richmond
## ELLEN MARIE QUIGLEY
v.
## COMMONWEALTH OF VIRGINIA
No. 0419-90-2
Decided March 3, 1992

Counsel

Craig S. Cooley, for appellant.

Janet F. Rosser, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

Opinion

**BAKER, J.**—Ellen Marie Quigley (appellant) appeals from her bench trial conviction by the Circuit Court of the City of Richmond (trial court) for possession of more than five pounds of marijuana with intent to distribute in violation of Code § 18.2-248.1(3). The sole issue presented by this appeal is whether the trial court erred when it overruled appellant's motion to suppress the evidence of the marijuana found in her car and in a hotel room, along with $11,250 cash. Finding no error, we affirm.

On May 22 and 23, 1989, Richmond Police Officers Lloyd Booth, Ronald D. Reed, Johnny Venutli and Detective Holston, all assigned to the Narcotics Division, were involved in the investigation and arrest of appellant for possession of more than five pounds of marijuana with intent to distribute. Henrico County Investigator Steven B. Shaw and his narcotics search dog "Ben" assisted in the investigation and discovery of the marijuana in appellant's possession.

Upon familiar principles, we recite the facts in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. *Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). The investigation began as a result of information supplied to Booth on May 22, 1989, by an informant, who previously had given him information which proved to be reliable and which had culminated in at least one conviction. The informant told Booth that a female named Quigley was staying at La Quinta Motel, was driving a rental car bearing Massachusetts plates although she was from California, and had in her possession a large quantity of marijuana. Upon receiving that information, Booth went to the motel, checked its parking lot and found a rental car with Massachusetts license plates on it. He inquired at the motel and verified that a person named Ellen Quigley was registered in Room 309.

On May 23, 1989, after discussing tactics to be used in their investigation, the officers, including Investigator Shaw and the dog, "Ben," stationed themselves and their unmarked vehicles at various places in and around the motel parking lot. From their respective positions they could view the motel and the Massachusetts licensed car. Shaw was driving a van with a siren and blue lights. The others were in unmarked cars. Reed's car had a telephone and, in accordance with the police plan, he called appellant, told her that he was the maintenance man and that he had "heard some narcotics officers were checking on who was in the room." Without responding to that information, appellant within "forty-five seconds" left her room "at a fast pace," and, carrying a duffel-type bag, ran to the rented Massachusetts licensed vehicle, "looked all around in each direction," put the bag in the trunk of the vehicle, "jumped in the driver's door" and drove off. Suspecting that appellant might be carrying marijuana, and in furtherance of their investigation, the police attempted to block her normal exit route with their cars.

Shaw was sitting in a position where he could see appellant leave the motel and place the bag in the trunk of her car. Three of the police cars attempted to place their vehicles in positions to stop appellant. To avoid them, she drove onto the curb section, then back onto the roadway, then back onto the curb, along the sidewalk, back onto the adjoining street and "headed toward the Turnpike." As she entered the adjoining street, Shaw activated his

blue lights and siren and fell in behind her. At the turnpike, a short distance from the motel, appellant ran a stop sign, nearly causing a collision with another car that braked so hard it slid on the street. Shaw kept his whirling blue lights and siren activated during the entire chase. Approximately three quarters of a mile away, Shaw caught up with and passed appellant's car and, with the other police cars, was able to stop her from further flight by blocking her passage.

Shaw is an experienced canine handler and had been working with the golden retriever, "Ben," who was trained to alert to the presence of concealed narcotics. Shaw and "Ben" twice circled the outside of appellant's car. Experienced dog handlers refer to the first pass as a "free pass," which merely orients the dog to location, wind and current. On the second pass, "Ben" showed "interest in the trunk." When they moved to the driver's door, "Ben" entered and immediately went to the rear seat and started clawing. "Ben's" clawing in this manner indicated to Shaw that the dog had discovered narcotics in the trunk area.[1] The police procured the trunk keys, opened it and found the duffel bag containing nineteen plastic Ziploc bags with marijuana inside.

At the time the marijuana was discovered in the trunk, appellant was seated in the car with Detective Holston. After the marijuana was found, he advised her of her rights and placed her under arrest. After her arrest, appellant told Holston that she had left a six-month old baby in the motel room. Other police were notified to go to the room to assure the baby's safety. Holston asked appellant for her consent to search the motel room and she agreed. Subsequently, at the motel, she voluntarily signed a consent to search form.

When the police entered appellant's motel room for the purpose of securing the baby's safety, they found in plain view a plastic garbage bag which also contained marijuana. The police found a total of 18.29 pounds of marijuana and $11,250 in cash in appellant's possession or under her control.

Prior to the hearing from which this appeal emanates, appellant filed a motion to suppress the evidence of marijuana found in the

---

[1] "Ben" had alerted to the presence of drugs fifty to sixty times and had never given a false alert.

car trunk and her motel room, alleging that the marijuana was discovered as a result of unlawful searches. In her motion, appellant asserted that she merely "left her motel room to move her automobile from one location to another within the parking lot," and that her consent to search her motel room was given solely because "it was the only way she would be able to stay with her six-month old daughter."[2]

■ In her brief when stating the facts, appellant concedes that an "informant had called in to advise [the police] that he had been told by someone that a female was in Room 309 of the La Quinta Motel traveling and selling marijuana."[3] She then argues that this information did not establish probable cause. We do not disagree with that statement; however, an informant's tip may be sufficient to support a *Terry*[4] stop even though the information given is insufficient to support issuance of an arrest or search warrant. *Adams v. Williams*, 407 U.S. 143, 147 (1972); *Williams v. Commonwealth*, 4 Va. App. 53, 64, 354 S.E.2d 79, 85 (1987). The *Terry* principles apply equally to an automobile stop. *See Pennsylvania v. Mimms*, 434 U.S. 106 (1977); *Williams*, 4 Va. App. at 64, 354 S.E.2d at 85.

■ *Terry* established that police officers may approach a person for the purpose of investigating *possible* criminal behavior even though no probable cause exists for arrest. *Terry* further held that whether the stop was justified is dependent upon whether "the facts available to the officer *at the moment of the seizure* or the search [would] 'warrant a man of reasonable caution in the belief' that the action was appropriate." *Terry*, 392 U.S. at 21-22. Here, the record supports the belief that "at the moment of seizure" the action taken by the police was warranted.

The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary,

---

[2] Appellant did not support these assertions with evidence.

[3] The trial court agreed with appellant's assessment of the facts contained in the record and at the conclusion of the evidence and arguments made findings of fact that a reliable informant had advised the police that drugs were being distributed from a room in the La Quinta Motel by a female named Quigley who was driving a rented car bearing Massachusetts license plates.

[4] *Terry v. Ohio*, 392 U.S. 1 (1968).

*Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Adams*, 407 U.S. at 145-46 (citations omitted).

█ The level of suspicion required from a *Terry* stop is less demanding than the standard of probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). There may be circumstances where wholly lawful conduct might justify the suspicion that criminal activity may be afoot. *Id.* We hold that, having verified all the matters that were reported to them by the informant except the actual possession of the contraband, and having observed appellant, within forty-five seconds after receiving the telephone call, rush from her room carrying a bag which could conceal contraband such as had been reported to them, and jump into her car as if to flee the scene, the police had reasonable suspicion of criminal activity and were justified in attempting to stop her in order to continue their investigation. *See Draper v. United States*, 358 U.S. 307 (1959). We further hold that when appellant failed to respond to the blue lights and siren following immediately behind her[5] and ran the stop sign nearly causing a collision with another car, the police were justified in blocking her from further flight[6] and using the narcotics search dog in furtherance of their investigation.

Appellant does not contend that the dog search *per se* was unlawful. The validity of that search is supported by ample authority. *See United States v. Lewis*, 708 F.2d 1078, 1080 (6th Cir. 1983). *See also United States v. Stone*, 866 F.2d 359 (10th Cir. 1989); *United States v. Lovell*, 849 F.2d 910 (5th Cir. 1988); *United States v. Sullivan*, 625 F.2d 9 (4th Cir. 1980), *cert. denied*, 450 U.S. 923 (1981); *People v. Dunn*, 155 A.D.2d 75, 553 N.Y.S.2d 257 (1990), *cert. denied*, 501 U.S. 1219 (1991); *State v.*

---

[5] Flight may supply "reasonable suspicion" when made in the face of lawful authority. *United States v. Lane*, 909 F.2d 895, 899 (6th Cir. 1990), *cert. denied*, 498 U.S. 1093 (1991).

[6] "Flight invites pursuit and colors conduct which hitherto has appeared innocent." *Lane*, 909 F.2d at 899.

*Slowikowski*, 87 Or. App. 677, 743 P.2d 1126 (1987), *aff'd*, 307 Or. 19, 761 P.2d 1315 (1988); *People v. Mayberry*, 31 Cal. 3d 335, 644 P.2d 810, 182 Cal. Rptr. 617 (1982).

■ Finally, appellant asserts that her consent to search her motel room was not voluntary because it resulted from "the creation of the situation by the police." We find nothing unlawful in the police tactics used in furtherance of its investigation. *See Stamper v. Commonwealth*, 228 Va. 707, 715, 324 S.E.2d 682, 687 (1985). Custody alone does not demonstrate coerced consent. *See United States v. Watson*, 423 U.S. 411 (1976). Whether consent to a warrantless search is voluntarily given is a question of fact which must be determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *Lowe v. Commonwealth*, 218 Va. 670, 678, 239 S.E.2d 112, 117 (1977), *cert. denied*, 435 U.S. 930 (1978); *Hairston v. Commonwealth*, 216 Va. 387, 388, 219 S.E.2d 668, 669 (1975), *cert. denied*, 425 U.S. 937 (1976). The record supports the trial court's finding that the consent was voluntarily given, and no evidence supports appellant's assertion that threats to keep her from her baby caused her to consent involuntarily to the search of her motel room.

■ In summary, the tip received by the police in this case justified prompt action. *See Hollis v. Commonwealth*, 216 Va. 874, 876, 223 S.E.2d 887, 888 (1976). In their investigation, the police verified all the information supplied by the informant that could be verified by observation. *See id.* The stop was within the limits prescribed by *Terry* and no evidence contradicts the inference from the proved facts that appellant intended to flee even after police presence was proved by Shaw's actions. When the narcotics search dog alerted to the presence of the contraband, probable cause for the search existed. *See Hollis*, 216 Va. at 878, 223 S.E.2d at 890. "The probable cause standard does not require actual knowledge. 'Only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause. . . .' " *Westcott v. Commonwealth*, 216 Va. 123, 126, 216 S.E.2d 60, 63 (1975)(quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)).

For the reasons stated, the judgment of the trial court is affirmed.

*Affirmed.*

Elder, J., concurred.

Benton, J., dissenting.

I disagree with the majority's view that *Terry v. Ohio*, 392 U.S. 1 (1968), provides a legal justification for the police conduct and resulting stop of Ellen Marie Quigley. Lacking a reasonable and objective basis for making a *Terry* stop, the police impermissibly created an exigency upon which they relied to buttress their deficient basis of knowledge. I would reverse the conviction because of the trial judge's failure to suppress the evidence.

The record proves that these events began after Officer Booth received information from an unidentified informant. However, the reliability of Booth's informant is not a factor in the analysis of this issue and is improperly used to buttress an unlawful stop. The informant told Booth that some other person, also unidentified on the record, told the informant "that a female with the last name of Quigley was staying at the La Quinta Motel on Midlothian [Turnpike, that] she was from California [, and that she] [w]as there driving a rental car with Massachusetts plates." Booth did not testify as to any other information that he obtained from the informant. Thus, the record clearly establishes that information that Booth relied upon came from an unknown, unidentified third person.

> Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simple rule will not cover every situation. Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized.

*Adams v. Williams*, 407 U.S. 143, 147 (1972).

The record proved that the informant was merely a conduit to Booth from the unknown, unidentified third person. Although the reliability of Booth's informant may support the conclusion that

the informant did not create the tip from his own imagination, it does not by inference provide indicia of reliability to the informant's informant. The record, thus, only supports the conclusion that the information Booth acted upon came from a person whose reliability is unproved.[7]

Another police officer, Reed, testified, over objection, that Booth told him that Quigley "was traveling, had at least one hundred pounds of marijuana with her." Although the trial judge's ruling on the objection is not precise, it appears that the trial judge did not admit Reed's testimony in evidence to establish the content of the information that the informant relayed to Booth. Reed did not know Booth's source of information. Reed's testimony was admitted only to prove what Booth told Reed.[8] Moreover, Booth never testified that the informant told him that Quigley had marijuana.[9]

---

[7] When a motion to suppress is based on "double hearsay" information, there must be a showing that both levels of hearsay are reliable. A testifying officer must show the veracity and basis of knowledge at both levels. Since it is unlikely that the police officer used the informant's "informant" in the past, he will not be able to establish credibility based on past performance. This means he will have to show veracity based on a declaration against penal interest or some other acceptable indication of reliability. *See* 1 W. LaFave, *Search & Seizure* § 3.3(d)(1) (2d ed. 1987).

[8] On the Commonwealth's direct examination, Reed testified as follows:
Q: What information did you receive, sir?
A: Information I received from Detective Booth was that there was a white female staying at the La Quinta, Room 309, driving a blue vehicle with Massachusetts plates, information that she was traveling, had at least one hundred pounds of marijuana with her.
Q: So on May 23rd —
[DEFENSE COUNSEL]: If I could, Judge, I assume we're going to hear from Detective Booth. We're really talking hearsay, on hearsay.
THE COURT: Well, probable causes, he could get to the matter — you may have to go back to Booth.
[DEFENSE COUNSEL]: Yes, sir, that's fine.
THE COURT: That's the rule.
[DEFENSE COUNSEL]: If he is saying the informant gave it to us. I assume that is what Mr. Booth is going to say, but to say Mr. Booth —
THE COURT: He never said the source of Mr. Booth's information. He just said he told him.
[DEFENSE COUNSEL]: That's my concern. I assume they're going to tie that up.
THE COURT: I don't know if he knows. Do you know the source of his information?
SGT. REED: No, I do not.
Q: All right, sir, so what events took place on May 23rd that you were a witness to?

[9] Although appellant's brief states that an "informant had called in to advise that he had been told by someone that a female was in Room 309 . . . selling marijuana," the

Obviously, Reed's reliance on unsubstantiated information that was proved to originate from Booth, a fellow police officer who had no personal knowledge, cannot be used as a basis for supporting the stop. *Cf. Whiteley v. Warden*, 401 U.S. 560 (1971)(where officers acted on a police radio broadcast of what was later proven to be an illegal arrest warrant based on an uncorroborated informant's tip, the illegal arrest could not be rendered valid because the instigating officer relied on fellow officers to make the arrest). In the absence of facts concerning the source of Booth's basis for the information that he gave to Reed, the Commonwealth cannot rely upon one police officer's tip to another police officer as a basis to assert the existence of "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

Based upon information from an unknown source and upon a belief that insufficient bases existed for obtaining a search warrant, several plain clothed police officers began a surveillance of the motel parking lot the day after Booth received his information. The officers were sitting in at least four or five different rental vehicles, none of which contained police markings. One officer was described as having a beard and occupying a red Camero vehicle. The dress and outward appearance of the other officers were not described. A van containing the police dog was described as "a plain '88 Chevrolet Astro Van [with] sirens in the grille and a bubble light that sits on the dash."

Prior to noon, one of the officers called Quigley's room and stated:

I don't know if you are interested or not. This is the maintenance man. I heard some narcotic officers were checking on who was in the room.

Quigley quickly left her room, ran to the vehicle that the officers were watching, put a bag in the trunk, and began to drive away. When her vehicle began to move, "three, four, five" of the unmarked, rental vehicles occupied by the plainclothed officers at-

record does not support that assertion. The majority considers that statement to be a concession by appellant. I believe that statement can be read to be no more than an erroneous recitation of the facts. The appellant has not advised that he knowingly yields to the misstatement regardless of its accuracy.

tempted to block Quigley's vehicle.

When the officers attempted to forcibly stop Quigley, they lacked "a reasonable suspicion, based on objective facts, that [Quigley was] involved in criminal activity." *Brown v. Texas*, 443 U.S. 47, 51 (1979). They knew from the informant's informant only that Quigley was staying in the motel, that she was driving a rental car with Massachusetts plates, and that she was from California. They had verified the first two facts. They also knew that their call to her room informing her that "some narcotic officers were checking on who was in the room" caused her to flee the room with a bag. The facts that the police relied upon amount to no more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27. The tip did not provide a range of detail that would elevate the "hunch" to a reasonable suspicion. Moreover, the tip did not contain predictions of future activities that, when confirmed, courts have found to provide indicia of reliability. *See Alabama v. White*, 496 U.S. 325, 332 (1990). "Manifestly, this conduct falls far below activity necessary to justify a reasonable suspicion that a violation of law had occurred or was occurring." *Zimmerman v. Commonwealth*, 234 Va. 609, 612, 363 S.E.2d 708, 710 (1988).

Conduct occurring after Quigley entered her vehicle that was used as a basis for making a traffic stop was the result of an impermissible exigency created by the police officers. Government agents may not justify an intrusion protected by the fourth amendment on the basis of exigent circumstances of their own making. *United States v. Thompson*, 700 F.2d 944, 950 (5th Cir. 1983). Virginia case law has not addressed the validity of police created exigencies used to effect a traffic stop. However, in *Crosby v. Commonwealth*, 6 Va. App. 193, 201, 367 S.E.2d 730, 735 (1988), this Court did find police-created exigencies an impermissible factor weighing against the warrantless entry of a dwelling to secure the premises.[10] At a minimum, this Court has adopted the

---

[10] Police-created exigencies are the third factor of the following three-part test:
(1) police officers have probable cause to believe evidence is on the premises;
(2) delaying entry would create a substantial risk that evidence will be lost or destroyed or the critical nature of the circumstances prevents the use of a warrant procedure; and
(3) the police must not be responsible for creating their own exigencies.
*Crosby*, 6 Va. App. at 201, 367 S.E.2d at 735.

posture that police created exigencies will factor negatively into an examination of the constitutional validity of a search and seizure.

Other courts have more directly stated that police officers cannot justify a search on the basis of exigent circumstances which they create themselves. "It is true that police officers cannot deliberately create exigent circumstances to justify the warrantless entry into a private dwelling." *United States v. Socey*, 846 F.2d 1439, 1448 (D.C. Cir.), *cert. denied*, 488 U.S. 858 (1988). "Where agents create the exigency themselves, warrantless activity is per se unreasonable and we require suppression of any evidence obtained thereby." *United States v. Webster*, 750 F.2d 307, 328 (5th Cir. 1984) (citing *United States v. Scheffer*, 463 F.2d 567, 574 (5th Cir.), *cert. denied*, 409 U.S. 984 (1972)). "[A] warrantless search may not be justified on the basis of exigent circumstances which are created by the government itself." *United States v. Hultgren*, 713 F.2d 79, 86 (5th Cir. 1983). Whether this principle is applied to the warrantless search of a dwelling or some other government action from which citizens are protected by the fourth amendment, the result should be the same: government agents cannot circumvent the constitutional requirements of the fourth amendment by manufacturing exigencies.

The police officers did not merely present Quigley with an "opportunity" to commit a crime. Rather, as adduced from their own testimony, the officers tricked Quigley into action which allowed them to graft her "flight" onto information which, as they freely admitted in testimony before the trial court, failed to establish "probable cause" to search her room or the trunk of her automobile while it was parked in the motel lot. "Agents, of course, cannot deliberately create exigent circumstances in order to subvert the requirements of the fourth amendment." *Webster*, 750 F.2d at 327.

As the record indicates, when the four or five rental cars, driven by non-uniformed officers, converged rapidly upon Quigley's vehicle, she sped out of the lot and onto the adjoining street where she failed to stop at a traffic control stop sign. The record is ambiguous concerning the distance from the parking lot to the stop sign. The officer who drove the van testified as follows:

Q: Let me just, for the record, if I could, the La Quinta Motel is literally nestled in against the intersection of the Midlothian Turnpike and Chippenham Parkway; isn't that right?

A: That's correct. Where she came from in the parking lot I would say about an eight-block length from the Midlothian Turnpike.

However, since the motel is "literally nestled in against . . . Midlothian Turnpike," it is reasonable to read the transcription of the officer's testimony of "an eight-block length" to mean "an eight-block length," rather than eight actual blocks, as determined by the majority.

The correct distance has some significance because of the implication in the majority opinion that Quigley ignored sirens and lights for eight actual street intersections and then failed to stop at the traffic control sign. The officer in the van was parked on the street adjoining the motel's parking lot. He activated his siren and light when Quigley and the chasing rental vehicles exited the lot. When Quigley went through the stop sign, two of the chasing "vehicles [were] packed in behind" Quigley's vehicle. The officer driving the van was able to get between Quigley's vehicle and the chase vehicles as they turned onto Chippenham Parkway from Midlothian Turnpike.[11] Quigley was stopped three quarters of a

---

[11] The reasonable inference to be drawn from the testimony of the officer who drove the van is that his van was several vehicles behind Quigley until after she ran the stop sign and turned onto Midlothian Turnpike. He testified as follows:

[T]he defendant got into the vehicle, backed out of a parking place there, at which time, three of the Richmond police cars moved on to the parking lot. I believe the first vehicle was operated by a Sgt. Reed. As he approached the vehicle the vehicle made an abrupt turn, came around Sgt. Reed. A second vehicle operated by Detective Holston then tried to place his vehicle in the position to stop her. She went up onto the curb section of the motel, came back out onto the roadway. As the third vehicle pulled in to block her she made an abrupt turn back on the curb. Then she went to the drive area of the motel, went out onto, I believe Wicks Street and headed towards Midlothian Turnpike. I was sitting on Wicks Street, southbound at that time. As soon as she came out and came onto Wicks Street I activated my blue lights and siren on the police van I was driving. We proceeded south on Midlothian Turnpike where she ran a stop sign. A vehicle had to apply his brakes and brake real hard and was sliding. I was able to get in between the two vehicles packed in behind the defendant. We proceeded to meet and we got onto the Chippenham Parkway and went approximately three-quarters of a mile near the Chippenham

mile later on the parkway.

The evidence in the record proves that the four or five vehicles that converged onto Quigley's vehicle in the parking lot were not identified in any way as police vehicles. Indeed, all were rental vehicles and all were driven by officers in some type of plain clothing. Only one of the vehicles was described in the record — a red Camero driven by a bearded officer. Only when Quigley exited the lot rapidly pursued by "three, four, five" such vehicles did the van, which also was unmarked and otherwise not identified as a police vehicle, join the chase with a siren and flashing blue light on the dash. However, the van was behind the two other unmarked vehicles chasing Quigley. No inference can be drawn that Quigley should have then known that the siren or lights were directed at her rather than at the vehicles chasing her.

Having instigated such an unorthodox attempt to trap a driver, without the presence of a visibly marked police vehicle or uniformed officers, the officers could have reasonably expected the driver to flee. Under these circumstances, Quigley's flight was neither objectively unreasonable nor a product of her own making. Since there was no manifestation of an outward symbol of police authority, no inference can be drawn that she was seeking to escape the police. The chase and the resulting infraction at the stop sign was an exigency that the officers created and cannot be considered an objectively reasonable basis to support a *Terry* stop.

Accordingly, I dissent.

Hospital. Some of the other police units caught up with me and we got the defendant blocked in and stopped. The whole time I had my blue lights and siren activated on the vehicle.