# CIRCUIT COURT OF THE CITY OF NORFOLK

Commonwealth of Virginia

v.

Lawrence Alden Elliott

## August 27, 1997

## Case No. CR97-002293-00

BY JUDGE LYDIA CALVERT TAYLOR

On June 4, 1997, Lawrence Alden Elliott was charged by the Grand Jury under Va. Code § 18.2-250 with knowingly, intentionally, and feloniously possessing cocaine. At a suppression hearing on August 15, 1997, this Court denied defendant's Motion to Suppress. The rationale for the denial is set out in this opinion, *infra.*

### *Facts*

As testified to at the hearing, Norfolk Police Officer W. J. Folscher was observing a house at 9508 Atlans Street based on a request from Investigator Mark J. Geier of the Norfolk Police Department, informing him that the house was guarded by vicious dogs, that pedestrians continuously were walking

through neighbors' yards to get to the back of the house, that the inhabitants of the house were heavily armed, and that visitors to the house all stayed for very short periods of time. (Geier had received his information from a confidential informant, who had proved reliable in the past, and who claimed to have purchased narcotics at the Atlans house.)

On March 3, 1997, in the early afternoon, Folscher had been observing the house for suspected drug activity for an hour or so, had seen four visitors go to the house for short visits, and had stopped two of the previous visitors to the house for brief questioning. None of the visitors on that day stayed at the house more than five minutes, confirming in Folscher's mind the earlier information that drug transactions were taking place as Geier had suspected. Folscher made stops of the last two visitors to the house before the defendant, in a manner substantially similar to the stop of defendant described below, except that the two previous stops did not involve vehicles. Neither of the first two visitors whom Folscher stopped were in possession of any narcotics, but both were known to the officer for criminal involvement in the past. The second of these two visitors, who was known to Folscher as a drug addict and for prostitution, freely admitted that the house was being used that day for selling drugs and that the visitor had just paid off a drug debt inside. Apparently concerned for Folscher, the second visitor warned him that a man just inside the barricaded front door had a rifle.

Folscher then observed the defendant, Lawrence Elliott, exit a truck – which had parked on a perpendicular street around the corner, not the street the house was on – make his way to the rear entrance of the house, and enter. Defendant exited the house two to three minutes later, at which point the truck turned the corner onto Atlans and stopped to pick up the defendant. Folscher, who was observing from down the block, approached the truck at this point, just as the defendant got in. Folscher stated that the motor was running as he approached, but the vehicle had not yet started to move after the defendant had gotten in; that Folscher requested that the defendant step out of the vehicle; and that once the defendant had gotten out, Folscher asked for his consent to search defendant's person, explaining his purpose, to which request the defendant freely consented.

There was a dispute in testimony at the hearing as to whether Folscher approached the truck alone or with two other officers, but all parties agreed that two other officers came on the scene, at a minimum, very quickly after Folscher made the arrest, if not simultaneous with the arrest of defendant. However, most importantly, the defendant himself only noticed Folscher and recalled no other police officers being present until he was arrested. Folscher

was dressed in a bicycle officer's uniform, and was clearly identifiable as a police officer, as were the other officers. None of the officers drew their guns, and only Folscher approached the defendant. Neither Folscher nor the defendant recalls other officers being present until after Folscher moved to arrest the defendant.

Folscher testified that he walked in front of the truck to the passenger side while the truck was stopped and asked defendant if he would get out of the truck. At that time, he testified, the other officers were nearby but not in view. He had a short introductory conversation with the defendant, explaining why Folscher had stopped him, asking what defendant was doing at the house, and asking for permission to search the defendant, who then gave his consent to the search. Folscher was unsure as to whether he asked or told defendant to exit the vehicle, but neither defendant nor Folscher recalled the officer's manner as being threatening or demanding. Folscher testified that he spoke in the same tone as at trial, which was quiet and calm. Folscher first patted down defendant for weapons, then made a full search, at which point he found defendant in possession of drugs, and arrested him.

Defendant, through his attorney, called three witnesses, each of whom was present in the truck when it was stopped: the driver, a female passenger, and the defendant. Don Fuller, the owner of the truck, was driving. Fuller testified that at least two officers, one with his hand up (indicating as one would when directing traffic to stop) signaled for Fuller to stop his truck. He described two officers at first on the driver's side of the truck, talking to Fuller, and one of the officers, Folscher, as then walking around to the passenger side of the truck and beginning to speak to the defendant. Fuller said he heard Folscher tell defendant to get out of the truck, he thought, but he was not able to hear much of the conversation, as Fuller claimed to be occupied talking to the other officer, the one who stayed on the driver's side of the truck.

Mary Quiram, defendant's girlfriend, was riding in the middle of the truck seat on the day in question. She testified that an officer told defendant to get out of the truck, with no discussion prior to the command. Quiram heard an officer tell Fuller to turn his truck off, then heard nothing more said to Fuller. She stated that the street was noisy, and it was hard to hear. Quiram paid little attention to Fuller's conversation because she was worried about the defendant.

Defendant then took the stand and stated that he had stayed in the house five to ten minutes. As he left the house, Fuller pulled up in the truck, and defendant approached the truck. At the same time, Folscher approached the truck with his hand up, as if directing traffic, to stop the truck. Folscher, he

said, approached the driver's side, and talked to Fuller, although defendant does not recall what was said between them, as defendant and Fuller had been drinking that day. Defendant said he did remember Fuller asking what was going on, and being told to turn the truck off. The officer then asked defendant to get out of the truck, and defendant did so. He went to the rear of the truck, at which point the officer asked him if he would consent to a search. Defendant gave his consent, and the officer took something out of defendant's pocket. Defendant agreed he felt no pressure to comply and gave consent to search of his own free will.

## Arguments of Both Counsel at the Hearing

The Deputy Commonwealth's Attorney argued that the stop of the truck was valid. He stated that the witnesses for the defense had given three different stories, admitted they were either flustered and not paying attention, did not or could not hear much, and/or had been drinking since morning (defendant and Fuller). Folscher's testimony, in contrast, was consistent, calm, and careful, thus throwing into question the credibility of all three defense witnesses. The Commonwealth's Attorney argued that under the most credible view of the evidence – the officer's version, combined with the defendant's own admission of the lack of any coercion on him and his freely given agreement to be searched – the defendant's consent to the search was not compelled. If the court accepted the officer's more coherent version of what had occurred, the Commonwealth's Attorney added, the approach was a consensual one and, even according to the defendant, consent was freely given to search him.

Defendant's attorney argued that in fact a stop had occurred, a stop for which the officer lacked articulable suspicion. He based his argument that a stop occurred on the defense witnesses' testimony that the vehicle was in motion when the officer signaled it with his hand to stop. (The court, however, found inconsistencies and other problems with the defense evidence on the point of whether there was a stop.) Defense argues that, if there was a stop, there was no reasonable suspicion to justify it: the defendant was never mentioned in the confidential informant's statements to Geier, the informant's information was scant, and neither of Folscher's first two stops of the day yielded narcotics or other reliable information based on prior experience with the two people stopped. All of these assertions undermine the quantum of information the officer had to go on and collectively add up to less than

reasonable suspicion, the defense insists. Folscher's conduct in making this stop was based on a hunch, and nothing more, the defense summarizes.

Even if the court were inclined to find the approach to be consensual, not even a brief stop, defense counsel argues, Folscher's "command" to defendant to get out of the truck negated consent and thus turned the encounter into a stop, which was not, as a whole, consensual. Whether the court accepts the defendant's story that the truck was moving before the officers stopped the defendant or the prosecution's story that the truck was already stopped before the officer asked to speak to the defendant, no reasonable person in either situation would feel free to leave, the defense argues.

Defendant, he insists, could not under these circumstances freely give consent to search his person. If the approach was not consensual, as defense argues, then it lacked the necessary reasonable suspicion to justify a brief stop, states defendant. The Commonwealth, on the other hand, argues that the encounter, while it should be seen by the court as consensual under the officer's version, is, in the alternative, justifiable as a brief stop or detention, based on the information the officer had, which he argues rose to the level of reasonable suspicion sufficient to justify a brief detention of a vehicle with an attendant order for passenger(s) to alight.

### Law

Defendant objected at the hearing to most of the Commonwealth's evidence of what Officer Folscher knew at the time of his approach to, or brief stop of, defendant as hearsay evidence, and thus, he argued, inadmissible. However, "if a statement is offered for any purpose other than to prove the truth of the matters asserted in the statement, it is not objectionable as hearsay," as it is " 'not hearsay' at all," which is the approach taken by McCormick, the Federal Rules of Evidence, and the Virginia Supreme Court. C. Friend, *The Law of Evidence in Virginia* (4th ed. 1993) § 18-3 at 93 (citations omitted).

Virginia law has long allowed what would otherwise be hearsay to be introduced for the limited purpose of elucidating why the witness did what he next did – that is, to explain the witness' *purpose* in doing something. In *Commonwealth v. Fuller*, 201 Va. 724 (1959), the Court allowed the hearsay statements of a complaining witness to explain why two police officers approached the defendant. "The truth of the complaining witness' allegation was not at issue. It was the fact that the complaint was made that was significant." Friend, *supra*, at 94. "Similar reasoning justifies the admission of

hearsay evidence as to the content of police radio broadcasts." *Id.* In addition, Virginia law allows evidence that would otherwise be hearsay to be used to show a witness' state of mind, where relevant. In an example of threats introduced into evidence, "it is the *fact that the threats were made* that is significant; whether or not they were *true* ... is immaterial." *Id.* at 97. Both of these examples are non-hearsay uses, that is, not offered for the truth of what was asserted by the absent declarant, but for another purpose, that is, to show purpose or state of mind.

Suppression hearings that weigh the quantum of evidence possessed by a law enforcement officer – prior to making a brief stop or full arrest – by their very nature are concerned with measuring what the officer knew, from any source, even hearsay sources, to see if the resulting decision by the officer – to stop or seize or search or arrest – was reasonable under the Fourth Amendment. Suppression cases abound with the presentation of such evidence. The Commonwealth presented a number of such cases in its brief to the court, including the leading Supreme Court cases of *Illinois v. Gates*, 462 U.S. 213 (1983), and *Alabama v. White*, 496 U.S. 325 (1990). Letter dated August 19, 1997, from S. Clark Daugherty to the Honorable Lydia C. Taylor.

The next issue for the court's decision is whether, weighing all the evidence the officer had when deciding to briefly detain the defendant (if the court finds he did not encounter defendant in a consensual or voluntary way for a brief time), did the officer have reasonable suspicion? "An informant's tip may be sufficient to support a Terry stop [under *Terry v. Ohio*, 392 U.S. 1 (1968)] even though the information given is insufficient to support issuance of an arrest or search warrant. The Terry principles apply equally to an automobile stop." *Quigley v. Commonwealth*, 14 Va. App. 28, at 32, 414 S.E.2d 851, at 853 (1992) (citations omitted). "The level of suspicion required from a Terry stop is less demanding than the standard of probable cause." *Id.* 14 Va. App. at 33, 414 S.E.2d at 853. "If an officer has an 'articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of the law,' the officer may conduct an investigatory stop of the vehicle limited in time and scope to ascertaining whether the suspicions are accurate." *Murphy v. Commonwealth*, 9 Va. App. 139, at 143, 384 S.E.2d 125, at 127 (1989) (citations omitted). "In determining whether an 'articulable and reasonable suspicion' justifying an investigatory stop of the vehicle exists, courts must consider 'the totality of the circumstances — the whole picture.' Each instance of police conduct must be judged for reasonableness in light of the particular circumstances." *Id.* 9 Va. App. at 144, 384 S.E.2d at 128 (citations omitted).

This case is to be judged by its particular facts and circumstances. However, *McGee v. Commonwealth*, 23 Va. App. 334, 477 S.E.2d 14 (1996), is very close on its facts to the instant case. In *McGee*, officers were dispatched to check a report by an anonymous informant that drugs were being sold at a particular location by a particular man. Three officers, in uniform, arrived at the location and approached the defendant. In a normal speaking tone of voice, the lead officer informed the defendant that they had received a report of drugs being sold by him and asked for permission to search him for weapons. The defendant consented and was also asked to open his clinched fists. When he opened his hands, crack cocaine was discovered. "The trial judge concluded that the information provided to [the officer], coupled with [the officer's] observations confirming the reliability of the anonymous tip, provided [the officer] with a reasonable, articulable suspicion that the defendant was involved in criminal activity." *Id.* 23 Va. App. at 338, 477 S.E.2d at 16.

The uncontroverted evidence in this case establishes that the initial encounter between the defendant and the police was consensual and that the officers did not seize him for Fourth Amendment purposes. The officers approached the defendant in a public place and initiated a conversation in the course of investigating the anonymous report of drug dealing. The police officers had a duty to investigate the complaint of criminal activity, and it was reasonable for them to question the defendant, who was the only male at the reported location. Although the three officers who confronted the defendant were in uniform, they made no show of force. They did not "run up to" the defendant and did not draw their weapons. According to [the lead officer], the officers were standing in front of the defendant but did not block him from leaving in any direction. [The officer] testified that he spoke to the defendant in the same tone of voice he was using while testifying and that none of the officers touched the defendant before he consented to the pat down search. [The officer] approached the defendant, explained that the police had received a report of someone selling drugs on that street corner, and said that the defendant matched the description. [The officer], however, did not accuse the defendant of selling drugs. Rather, [the officer] simply told the defendant the reasons for approaching and asking him questions. *Under these circumstances, we hold that no Fourth Amendment seizure occurred*

*Id.* 23 Va. App. at 341, 477 S.E.2d at 17 (emphasis added).

In the instant case, although no information from an informant focused on the defendant, there was even more information about criminal activities, including: (1) verification of the information passed on to Folscher by Geier by Folscher's own observances, (2) what Folscher himself had heard over the radio about neighbors' complaints, (3) Folscher's personal knowledge about criminal activities by two of the four people who entered the house, and (4) Folscher's confirming conversation with the fourth man, a drug addict known to him, about drugs, guns, and a barricade in the house. Although defendant here was just one of the many suspected drug customers of the house — and thus not subject to prior identification by any informant — his *modus operandi* matched those of the other drug customers: back door entrance, a few minutes stay, and a quick exit. The fact that defendant met the pattern of other drug customers was bolstered by his arrival in a vehicle that, instead of parking in front of the place he intended to enter, stopped around the corner, apparently out of view, and which vehicle only approached close to the house, with the motor still running, while it briefly stopped in front, when the defendant exited a few minutes later. Thus, in this court's opinion, the officer at that point had reasonable suspicion — not just a "hunch" — based on articulable facts supporting the stop.

However, even if the appellate court were to find that such amounted to less than reasonable suspicion, it is this court's opinion that the officer's approach to the passengers of the truck – alone, with no show of weapons or force, and speaking in a quiet, calm, non-threatening tone of voice, while the truck was still stopped although the motor was running, and thus with no need to even raise a hand to "stop" the still-stopped truck – amounted to only a brief, consensual encounter. The defendant agreed to step out of the truck and, when the purpose was explained, consented for his person to be search for drugs. Defendant himself admitted that he freely and voluntarily consented to such a search. Under these circumstances, the brief encounter could be seen as a consensual one until the point of defendant's arrest on probable cause came upon the officer finding the drugs on defendant's person.

### Summary

*McGee*, aside from the presence of the truck in the instant case, is nearly identical to the situation in which defendant Lawrence Elliott found himself. As stated above, the standards for a Terry stop are the same whether or not a vehicle is involved. Even if such a level of justification were missing, the brief approach by one officer to a stopped vehicle, with its motor running, on

a public street, was a consensual encounter. Given the officer's quiet voice and request, and defendant's own acknowledgment that he consented to his person being searched freely and without any compunction, the search was permissible as a consensual encounter, even if reasonable suspicion, as found by this court's ruling, is found not to exist by an appellate court.

In sum, on the facts as presented at the suppression hearing on August 15, 1997, the defendant's motion to suppress the drugs seized off him as unconstitutionally gotten is denied.