## Richmond

DAVID LEROY CROSBY

v.

COMMONWEALTH OF VIRGINIA

No. 1434-85

Decided April 19, 1988

COUNSEL

Dwane H. Miller, for appellant.

Thomas C. Daniel, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

COLE, J. — David Leroy Crosby was convicted in a bench trial of unlawful possession of a sawed-off shotgun and possession of Preludin, a Schedule II controlled substance. He was sentenced on the drug possession charge to a term of ten years imprisonment, with two years suspended; imposition of sentence was suspended on the charge of possession of a sawed-off shotgun. The issue raised on this appeal is whether the trial court erred in refusing to suppress the sawed-off shotgun because of an alleged violation of his fourth amendment rights against unreasonable searches and seizures. We affirm the trial court.

On January 17, 1985, Detective D. R. Carter received information from a reliable informant that within the past ten hours the informant had observed David Leroy Crosby selling Preludin in his apartment at 106 East Clay Street in Richmond, and that Crosby had more of it to sell. At approximately 11:00 a.m., Detectives Carter, Fleming and Clevert encountered Crosby walking in the 500 block of North Second Street, just around the corner from Crosby's residence. Carter advised Crosby that he "had information that [Crosby] was selling Preludin, and that [Crosby] was in possession of Preludin at 106 East Clay Street in the downstairs apartment." Carter further told Crosby that he intended to get a search warrant for the premises and that to prevent destruction of the evidence at the apartment, Crosby would be detained until a search warrant could be obtained.[1] Detective Carter asked Crosby if anyone else was in the apartment. When he received no

---

[1] Crosby does not challenge the legality of the initial detention.

response, Carter asked Crosby for the key to the apartment. Crosby complied and gave him the key.

Detective Carter left Crosby with Detectives Fleming and Clevert and went alone to the apartment to determine whether anyone was there who would destroy evidence. He was concerned about the remaining Preludin being destroyed because there were other people on the street who knew Crosby and saw him being detained and because the detention was "just around the corner" from Crosby's apartment.[2] Furthermore, the informant had told Detective Carter that there were other people in Crosby's apartment when he had been there less than ten hours earlier.

When Detective Carter arrived at Crosby's apartment building, he did not knock on the door before entering; he did not recall if he listened for activity inside and had no recollection of hearing anything. He heard noises in the apartment building, but he could not say they were coming from Crosby's apartment. He unlocked the door and observed a sawed-off shotgun on the bed only a few feet away. Carter radioed Fleming and told him to place Crosby under arrest for possession of the shotgun.[3] Detective Carter looked under the bed and in a large cabinet to make sure no one was in the room.

After securing the premises, he went to the magistrate's office to obtain a search warrant for drugs. In the affidavit for a search warrant, Detective Carter stated that he had information from a reliable informant that Crosby was in possession of Preludin at his apartment, that Crosby admitted he had some Preludin the preceding night, and that Detective Carter observed a sawed-off shotgun on the bed of Crosby's apartment. At 11:50 a.m. the warrant was issued for Preludin and related drug paraphernalia. At 12:00 noon the search warrant was executed. The sawed-off shotgun, Preludin and paraphernalia were seized pursuant to the search warrant.

---

[2] There were at least three windows in Crosby's apartment which faced the street.

[3] Crosby does not challenge the legality of his arrest for possession of the sawed-off shotgun. In view of the discussion that follows, we observe that if the legality of Crosby's arrest was in issue and if the Commonwealth sought to sustain probable cause to arrest solely on the basis of Carter's initial "plain view" seizure of the shotgun, a substantial fourth amendment issue would be presented.

A motion to suppress the sawed-off shotgun, Preludin, and paraphernalia was heard by the trial court on April 23, 1985. The trial court denied the motion, finding that the defendant consented to the search by surrendering the key to the apartment.

On this appeal, Crosby contends that his actions did not amount to consent and therefore, the sawed-off shotgun was unconstitutionally obtained. The Commonwealth argues that, even if Crosby did not consent to the search, Detective Carter was justified under the circumstances in securing the premises, or in the alternative, that the inevitable or independent source exceptions to the exclusionary rule apply.

## I. *CONSENT*

We must first determine whether Crosby consented to the search, as contended by the Commonwealth. There are some basic guidelines to aid us in determining whether Crosby consented to the search of his apartment. We commence with the principle that, subject to a few specifically established and well delineated exceptions, a search and seizure conducted without a warrant issued upon probable cause is *per se* unreasonable. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). However, the fourth amendment prohibition against unreasonable searches and seizures may be waived by free and voluntary consent of the defendant to the search and seizure. *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *Hairston v. Commonwealth*, 216 Va. 387, 388, 219 S.E.2d 668, 669 (1975), *cert. denied*, 425 U.S. 937 (1976). "The burden, of course, is upon the Commonwealth to show that consent is freely and voluntarily given." *Hairston*, 216 Va. at 387, 219 S.E.2d at 669.

The appellant and the Commonwealth are not in agreement concerning what the prosecution must prove to demonstrate that consent was freely and voluntarily given. The law, however, is well established:

[W]hen the subject of a warrant is not in custody and the state attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all

the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.

*Schneckloth*, 412 U.S. at 248-49.

■ Clearly, "when that 'consent' has been given only after the official conducting the search has asserted that he possesses a warrant" and he in fact does not have one, there can be no consent under such circumstances. *Bumper*, 391 U.S. at 550. In this case, Detective Carter did not make a misrepresentation concerning the warrant since he stated only that he intended to obtain one.

The record discloses that Detective Carter told Crosby that he "had information that [Crosby] was selling Preludin, that he was in possession of Preludin at 106 East Clay Street in the downstairs apartment . . . that he intended to get a search warrant for that premises, [and that Crosby] was going to be detained until a search warrant could be gotten to prevent destruction of the evidence at the apartment." Detective Carter asked Crosby who was in the apartment, and when he received no answer, he told Crosby to give him the keys to the apartment. Crosby then delivered the keys. He never gave any verbal consent to a search of his apartment.

Crosby contends that he gave no verbal or implied consent for the police to search his apartment. Rather, he gave the keys to Detective Carter upon request after being advised that he was being detained and that a search warrant was going to be obtained. The Commonwealth contends that Crosby consented to a search of his apartment when he delivered the keys to Detective Carter.

■ The Commonwealth's theory of consent is flawed because Detective Carter never requested permission to search the apartment. He, in fact, testified that he did not have consent. He requested the key and Crosby complied with his request. We do not agree with the trial court that these circumstances constitute valid consent. Carter informed Crosby that he intended to secure a search warrant in order to search the apartment. He needed the key to conduct the search under the authority of the warrant unless he also intended to forcibly gain entrance. It is reasonable to conclude that Crosby gave up the key to aid Carter in gaining

entrance after securing the search warrant. Acquiescence is not consent. In *Bumper*, the Supreme Court said: "This burden [to prove consent] cannot be discharged by showing no more than acquiescence to a claim of lawful authority." 391 U.S. at 548-49. We conclude that under the facts and circumstances of this case there was no free and voluntary consent to the search given by Crosby. Rather, Crosby provided the keys to the apartment to aid the police once a search warrant was obtained.

## II. *SECURING THE PREMISES*

The Commonwealth contends that, even without consent, Detective Carter was justified in entering the apartment to secure the premises before getting the search warrant because he had a reasonable belief that third parties who would destroy the evidence might be inside. If the police were lawfully on the premises to secure it, the Commonwealth argues, any evidence in plain view is clearly subject to seizure. They cite *Ker v. California*, 374 U.S. 23, 42-43 (1963) in support of their position. Therefore, if Detective Carter was lawfully in Crosby's apartment to secure it before obtaining a search warrant, the sawed-off shotgun would be admissible under the plain view exception to the warrant requirement.

In *Segura v. United States*, 468 U.S. 796 (1984), the United States Supreme Court, in a 5-4 decision, held:

> [W]here officers, having probable cause, enter premises, . . . and secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures.

*Id.* at 798.

This holding appears in Part I of the opinion which basically summarizes the two holdings[4] of the opinion. Part IV of Chief

---

[4] The other holding in *Segura* addresses the independent source exception to the exclusionary rule. Because we find that the police were lawfully securing the premises and therefore any evidence in plain view was subject to seizure without a warrant, we need not address the issue left open in *Segura*; namely, whether evidence observed in an initial, illegal entry to secure premises must be suppressed even though it is later seized pursuant to a valid search warrant.

Justice Burger's opinion contains the support for the holding, but it is joined in only by Justice O'Connor. The other three concurring justices did not write a separate concurrence. The precedential value of *Segura* is, therefore, uncertain. Furthermore, what is purportedly a holding in *Segura* is, in reality, arguably only dictum: because the Court held, in Part V of its opinion, that the evidence in question was admissible *even assuming* an unlawful entry and securing of the premises, it arguably was unnecessary for the Court in *Segura* to decide whether, in fact, the securing of the premises was unlawful.

Despite the lack of precedential value of *Segura* and its other difficulties,[5] we believe that a limited "securing of the premises" exception to the warrant requirement is appropriate. However, we do not hold that a warrantless entry to secure the premises prior to or while seeking a search warrant is justified in every instance.

■ "The right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590.

■ To determine whether a warrantless entry for the limited purpose of securing the premises is reasonable, we must balance the law enforcement need to preserve evidence and protect its officers against the individual's privacy interest in maintaining the sanctity of the home. We find that the balance is weighted in favor of entry when, based on the totality of the circumstances, the following factors are present:[6]

---

[5] *See* 4 W.R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment*, § 6.5(c), at 673-81 (2d ed. 1987); Dressler, *A Lesson in Incaution, Overwork, and Fatigue: The Judicial Miscraftsmanship of Segura v. United States*, 26 Wm. & Mary L. Rev. 375 (1985); Recent Developments, *The Securing of the Premises Exception: A Search for the Proper Balance*, 38 Vand. L. Rev. 1589, 1606-15 (1985).

[6] This test is adopted from federal circuit court cases and a commentator's proposal. *See* Recent Developments, *The Securing of the Premises Exception: A Search for the Proper Balance*, 38 Vand. L. Rev. 1589, 1616 (1985).

(1) police officers have probable cause to believe evidence is on the premises;

(2) delaying entry would create a substantial risk that evidence will be lost or destroyed[7] or the critical nature of the circumstances prevents the use of any warrant procedure;[8] and

(3) the police must not be responsible for creating their own exigencies.[9]

■ "[I]n determining whether . . . circumstances were sufficient to overcome the presumption of unreasonableness and justify a warrantless entry, the court must examine the circumstances as they reasonably appeared to the law enforcement officers on the scene [when the decision to enter was made]." *Verez v. Commonwealth*, 230 Va. 405, 411, 337 S.E.2d 749, 753 (1985), *cert. denied*, 479 U.S. 813 (1986). The test we announce today is not as stringent as the one that justifies entry based on the "exigent circumstances" exception to the warrant requirement. Where exigent circumstances exist, "a warrantless entry into a dwelling, a [full and complete] search of the interior, a seizure of contraband, and an arrest of those found in possession of it" is justified. *Id*. at 410, 337 S.E.2d at 752. However, where a "substantial risk that evidence will be lost or destroyed" is present, only a limited security check of the premises for people who might destroy evidence is warranted. Therefore, the circumstances justifying entry under the "securing the premises" exception need not be as exacting as those justifying entry under the "exigent circumstances" exception. The burden of proving justification, therefore, is not as heavy where the entry is only to secure the premises.

---

[7] *See United States v. Cuaron*, 700 F.2d 582 (10th Cir. 1983); *United States v. Agapito*, 620 F.2d 324 (2d Cir. 1980); *United States v. Edwards*, 602 F.2d 458 (lst Cir. 1979); *United States v. Gardner*, 553 F.2d 946 (5th Cir. 1977), *cert. denied*, 434 U.S. 1011 (1978); *United States v. Grummel*, 542 F.2d 789 (9th Cir. 1976), *cert. denied*, 429 U.S. 1051 (1977); *United States v. McLaughlin*, 525 F.2d 517 (9th Cir. 1975), *cert. denied*, 427 U.S. 904 (1976).

[8] *See Cuaron*, 700 F.2d at 589; *United States v. Hackett*, 638 F.2d 1179, 1185 (9th Cir. 1980).

[9] *See United States v. Segura*, 663 F.2d 411, 417 (2d Cir. 1981).

Once an entry has been justified under the three-pronged test enunciated above, in order to determine if anyone is present who might destroy evidence or pose a threat to police safety, police officers may conduct a limited security check in those areas where individuals could hide. If this security check reveals that no one is on the premises, the police have no legitimate reason to remain on the premises and should leave once they have secured the premises. If police suspect that others may soon arrive who would destroy evidence, they should then set up an external stakeout, which constitutes a lesser form of intrusion. *See Agapito,* 620 F.2d at 337.

Applying our facts to the three-prong test we adopt today, we find that Detective Carter was justified in entering to secure the premises. He had probable cause, based on information from a reliable informant, to believe that evidence was on the premises, and he reasonably believed, under the totality of the circumstances, that delaying entry to secure a warrant would create a substantial risk that evidence would be lost or destroyed based on Crosby's detention near his apartment, information from a reliable informant that others were in Crosby's apartment within the last ten hours, the fact that acquaintances of Crosby saw him being detained, and most importantly, his evasiveness when Detective Carter asked him if anyone was at the apartment. Furthermore, this is not a case where police created their own exigencies.

Once inside Crosby's apartment, Detective Carter did not exceed the scope of the limited security check. He ascertained that no one was on the premises. He then secured the premises and called for a police officer to stand guard on the premises while he went for the search warrant. Because Detective Carter was lawfully securing the premises, the evidence in plain view, i.e., the sawed-off shotgun, was subject to seizure under the plain view exception to the warrant requirement.[10]

---

[10] Detective Carter states that he "retrieved" and "took possession of the shotgun." However, it does not appear that the gun was physically seized until he returned with the search warrant thirty minutes later. The record, therefore, is unclear as to whether Detective Carter seized the sawed-off shotgun when securing the premises or when he returned with the search warrant, but the result is the same no matter when the seizure occurred. If he seized the gun at the time of the initial entry, Detective Carter properly seized the sawed-off shotgun under the plain view exception to the warrant requirement. If he seized the gun later, Detective Carter properly seized the shotgun pursuant to a valid search war-

Having concluded that Detective Carter was lawfully on the premises, we need not address whether the inevitable discovery or independent source exceptions to the exclusionary rule would apply. Accordingly, the trial court's decision is affirmed.

*Affirmed.*

Duff, J., concurred.

Barrow, J., dissenting.

Elimination of the warrant requirement in this case suggests that it should be eliminated in any case where there is probable cause to believe that contraband is being kept in a dwelling. This is contrary to the long settled rule that police may not search or seize contents of a home without a warrant. Justification for this departure cannot be found in *Segura v. United States*, 468 U.S. 796 (1984). Furthermore, the facts of this case do not support the test the majority derives from that opinion.

The critical facts of this case are undisputed. Two police detectives, one of whom had received information that the defendant had Preludin in his apartment, stopped and detained the defendant on a public street. One of the detectives took a key to the defendant's apartment from the defendant and went to his apartment. It was a one room apartment with only one door. The detective saw no one entering or leaving the apartment and did not have "any distinct recollection of hearing anything." He unlocked the door with the key he had received from the defendant, opened the door and entered the apartment. He saw a sawed off shotgun lying on the bed and took possession of it. He then left the apartment and went to obtain a search warrant.

This seizure defies the rule that police may neither search nor seize the contents of a home without a warrant. *See Segura v. United States*, 468 U.S. 796, 824, n.16 (Stevens J., dissenting); *Agnello v. United States*, 269 U.S. 20, 33-34 (1925). Unless there are exigent circumstances, a warrantless search is illegal. *Segura*, 468 U.S. at 810; *Vale v. Louisiana*, 399 U.S. 30, 33-34 (1970).

rant and the prior securing of the premises, being lawful, did not taint the subsequently obtained evidence.

To avoid application of this fundamental principle, the majority creates a new rule to justify this search. In doing so it relies on one part of an opinion by Chief Justice Burger in which only one other justice joined. *Segura v. United States*, 468 U.S. at 797.

The majority's reliance on *Segura* is misplaced because the Supreme Court excluded from its consideration the issue raised in this case. *Segura* involved two seizures, and only one of them was addressed by the Chief Justice's opinion. The Court did not consider the seizure which most closely parallels the seizure in this case.

In *Segura*, government agents entered an occupied apartment without a warrant, arrested the occupants and secured the apartment until a search warrant was obtained. They first seized contraband seen by the agents when they initially entered the apartment, and later seized contraband not seen during the initial entry but discovered after the search warrant was obtained. The district court held the initial warrantless entry unjustified by exigent circumstances and the first seizure, therefore, illegal. The Court of Appeals affirmed the district court, and the Supreme Court expressly excluded that issue from its consideration, saying "we have no reason to question the courts' holding that that *search* was illegal." *Id*. at 798. Furthermore, in *Segura* the initial entry was not a basis for obtaining the warrant; in this case the initial entry was part of the basis for obtaining the warrant. In *Segura*, the property seized during the second search was not suppressed as "fruit" of the illegal entry "because the warrant and the information on which it was based were unrelated to the entry and therefore constituted an independent source for the evidence under *Silvathorn Lumber Co. v. United States*." *Segura*, 468 U.S. at 799. The warrant in this case, however, was obtained, at least in part, based upon information acquired during the illegal entry. The affidavit upon which the search warrant was based described the initial entry and the presence of the sawed off shot gun.

Finally, even if there were authority to support the test proposed by the majority, the facts in this case do not meet the proposed test. One of the three tenets of the majority's test is that a delayed entry "would create a substantial risk that evidence will be lost or destroyed or the critical nature of the circumstances prevents the use of any warrant procedure." The facts in this case do not support that conclusion.

Circumstances did not prevent the use of a warrant procedure. In fact, the detective left to obtain the warrant immediately after he seized the shotgun, and obtained it within minutes after he left the defendant's apartment.

There was also no substantial risk that the evidence would be lost or destroyed. The defendant was being detained by the police and could not destroy the evidence or request someone to do it on his behalf. The one room apartment had only one door and, although someone had been in the apartment ten or more hours previously, there were no indications that anyone was in the apartment at the time the police entered.

Crosby's failure to respond when asked if anyone was in his apartment did not indicate a substantial risk that evidence was about to be destroyed. Crosby was not evasive, as suggested by the majority. He simply did not answer the question: a constitutionally protected, and perhaps prudent, course of action by someone confronted with police detention and accusation of illegal drug possession.

The shotgun was seized as a result of a warrantless entry in the defendant's home. Neither exigent nor other circumstances justified the warrantless entry. For these reasons I would reverse the conviction and remand the proceeding for a new trial.