COURT OF APPEALS OF VIRGINIA


Present: Judges Baker, Bray and Overton
Argued by Teleconference


COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
v.   Record No. 1523-97-1          JUDGE JOSEPH E. BAKER
                                      NOVEMBER 21, 1997
LARRY S. BAUMGARDNER


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Alan E. Rosenblatt, Judge

      H. Elizabeth Shaffer, Assistant Attorney
      General (Richard Cullen, Attorney General, on
      brief), for appellant.

      Joseph A. Migliozzi, Assistant Public
      Defender, for appellee.


In this appeal by the Commonwealth from the Virginia Beach

Circuit Court (trial court), the sole issue presented is whether

the trial court erred when it granted Larry S. Baumgardner's

(defendant) motion to suppress the evidence discovered by the

Virginia Beach police after their warrantless entry into

defendant's home. For the reasons hereinafter stated, we reverse

the judgment of the trial court.

Defendant was indicted for "cultivat[ing] Marijuana, not for

personal use," in violation of Code § 18.2-248.1 and obstructing

justice in violation of Code § 18.2-460.

The Commonwealth contends that the trial court erroneously

held that the community caretaker doctrine did not permit the

---

[*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

officers' warrantless entry of defendant's home.  In addition, it contends that, even if the initial entry violated the Fourth Amendment, the marijuana was discovered by an independent source, making it admissible despite the illegal entry, and that the trial court's ruling to the contrary was erroneous.

## Background

On the evening of June 11, 1995, Virginia Beach Police Officer Christopher Mras received a computer dispatch to assist Heather Burton with a dispute.  Mras and Officer Robert Hillers met Burton at a gas station, where she told them that she wanted assistance in getting her belongings out of the home in which she had worked as a live-in nanny.  Her employer, defendant, had fired her that day and had not allowed her to remove her belongings.

Burton told the officers that she was afraid to go to defendant's house alone because he had threatened her and was becoming violent.  Burton bore no signs of physical abuse, but Mras was convinced that Burton's fear of violence was reasonable.  Mras based this belief on an encounter he had had with defendant six months to a year earlier when defendant had attempted suicide and Mras had been dispatched to his home.[1]

Burton also told Mras that she had "seen some illegal drugs in the house that day" and told Hillers that, "a few days

---

[1] Defendant attempted to inhale carbon monoxide and then bug spray and became violent when Mras broke into his house to stop him.

before," defendant had said that he had marijuana plants on the back porch.

Police Sergeant J. B. Spry joined the group at the gas station, and they followed Burton to defendant's two-story home. When defendant responded to the knock on his door, the officers explained that they were there only "to keep the peace, make sure nothing happens, that no argument gets out of hand resulting in violence or any other type of altercation" while Burton retrieved her property. Defendant confirmed that Burton had resided in his house. He was "hostile" and "extremely belligerent" toward them, which led Officer Hillers to conclude that "if we were not there[,] there might have been a physical confrontation between [defendant] and [Burton]." When the officers requested entry, defendant allowed Burton to enter, but "was very adamant about [the police] not going into the house." Because Burton was afraid to go in by herself, the officers entered in order to protect her. At some point prior to their entry, Officers Mras and Hillers notified Spry that Burton had reported seeing narcotics in the house. However, Spry and Hillers testified that the officers' sole purpose in going into the house was to help Burton retrieve her belongings safely.

Inside, Officers Mras and Hillers remained on the ground floor and helped Burton remove her property from the ground floor bedroom she had occupied. Officer Spry waited near the front door. When Burton returned from retrieving her daughter's toys

- 3 -

and personal effects from the second floor, she told Officers Spry and Hillers that she had seen what she thought were marijuana plants in an upstairs attic closet area. She stated that she had taken a drug awareness course enabling her to identify the marijuana. Officer Spry then told defendant that he had reason to believe there were illegal substances in the house and asked for permission to search, but defendant refused consent. Spry then sent Hillers to obtain a search warrant and informed defendant and his wife that the officers would have to monitor the couple's movements to prevent the possible destruction of evidence while awaiting the warrant.

Defendant left the house, went jogging, returned and called his attorney. He then barricaded himself in the garage without police opposition. When the officers saw him dig a hole in the ceiling of the garage and saw his legs dangling from the ceiling, they believed that he might be attempting to reach the contraband on the second floor. To prevent the destruction of evidence, Officers Spry and Mras went upstairs, where they found defendant on his hands and knees stuffing marijuana plants inside his shirt and under the insulation in the attic. They secured defendant, and when the search warrant arrived, they retrieved the marijuana plants under the insulation and placed defendant under arrest.

In granting defendant's motion to suppress, the trial court concluded that "[t]he entry of the police and of Miss Burton into [defendant's] house was not legal." It found that defendant had

- 4 -

denied the officers' request to enter the house and that the officers' belief that Burton had either common authority over or "a sufficient relationship to" the premises to validly consent to their entry was not objectively reasonable.  It noted that exigent circumstances did not permit the initial entry of the premises because Burton could have regained her property without violence by pursuing her civil remedies.  It also held that the evidence was barred as derivative of the illegal entry--"the fruit of the poisonous tree"--and did not fit any of the exceptions for admissibility.  Finally, however, it found that the officers' entry to protect Burton was not pretextual, but nevertheless rejected the argument that the entry was justified under the "community caretaker exception" to the warrant requirement.  Although it acknowledged application of the doctrine "when there's an emergency situation where the police have a duty to act," it found that "any emergency which existed in this case was, in fact, created by the police conduct because if they had not gone to the premises, there would have been no confrontation between Miss Burton and [defendant]."

In reviewing the trial court's ruling on a motion to suppress, "[t]he burden is upon [appellant] to show that th[e] ruling, when the evidence is considered most favorably to the [party prevailing below], constituted reversible error."  Fore v. Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731 (1980).  Questions of reasonable suspicion and probable cause to make a

warrantless search are subject to de novo review on appeal.  See McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (en banc).  "In performing such analysis, we are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them[,] and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers."  Id. at 198, 487 S.E.2d at 261.

### Police As Community Caretakers

The community caretaker doctrine permits the police to "'engage in . . . community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'"  Commonwealth v. Waters, 20 Va. App. 285, 289, 456 S.E.2d 527, 529 (1995) (quoting Cady v. Dombrowski, 413 U.S. 433, 441 (1973)).

This doctrine recognizes that
> the duty of the police embraces the function of maintaining public order and providing necessary assistance to persons in need or distress.  An officer who harbors a reasonable and articulable suspicion, based upon observed facts or a credible report, that a citizen is in distress or in need of assistance, may lawfully effect an appropriately brief and limited seizure for the purpose of investigating that suspicion and rendering aid.

Id. (citation omitted).

Although the doctrine was originally applied in a case involving a motor vehicle, we held in Waters that "an officer's

- 6 -

community caretaking functions are not limited solely to automobile stops."  Id. at 291, 456 S.E.2d at 530.  In determining whether appropriate circumstances for a warrantless entry exist, a court must consider "whether:  (1) the officer's initial contact or investigation is reasonable; (2) the intrusion is limited; and (3) the officer is not investigating criminal conduct under the pretext of exercising his community caretaker function."  Id. at 290, 456 S.E.2d at 530.

In this case, defendant concedes that the officers' presence on his front porch was lawful but maintains that the trial court correctly held that the entry of both Heather Burton and the officers into his home was unlawful.  We disagree.  Under the rationale of the Fifth Circuit Court of Appeals in United States v. York, 895 F.2d 1026 (5th Cir. 1990), we hold that the community caretaker doctrine permitted the entry, and we reverse the trial court's ruling suppressing the evidence.  In York, a man named Bill[2] and his children had been living as guests, by invitation, in York's house.  Id. at 1027.  When the belligerent and intoxicated York threatened the live-in guests, they obtained police assistance to reenter the house, remove their belongings, and leave permanently.  Id. at 1027-28.  While on the premises assisting and protecting Bill and his family, one officer saw suspected illegal firearms in plain view.  Id. at 1028.  After

_____

[2]The opinion in York identifies "Bill" only by first name. See 895 F.2d at 1027.

- 7 -

Bill had finished removing his family's belongings, the officers left but reported seeing the firearms to the Federal Bureau of Alcohol, Tobacco and Firearms, which conducted an additional investigation, obtained a search warrant and eventually arrested York. Id.

The Fifth Circuit upheld the officers' warrantless entry of York's house as a community caretaker function. Id. at 1030. It considered first whether the officers' activity "intrude[d] upon a reasonable expectation of privacy in such a significant way to make the activity a 'search.'" Id. at 1028. It acknowledged that "'searches and seizures inside a home without a warrant are presumptively unreasonable,'" id. at 1029 (quoting Payton v. New York, 445 U.S. 573, 586 (1980)), but noted that one's "expectation [of privacy in the home] . . . can be reduced as a result of the activities of the home's occupants." Id. The Court in York reasoned that:

> because Bill and his children were guests, invited to live for a time in York's home, the threatening actions of York combined with this permitted occupancy to make it reasonable for Bill to enlist the aid of the police in removing from York's premises possessions that were incidents to his family's daily life. York's threats of violence to Bill and his children made it foreseeable that Bill would seek help in removing his possessions . . . . When York invited Bill and his family to share his residence, he necessarily invited the normal incidents of joint occupancy, including the introduction of property which belonged to Bill which Bill retained the right to remove when his invitee status ended. Likewise, when York became intoxicated and belligerent, it was reasonable to expect that Bill might

>           ask police officers to make a limited entry
>           into the house to keep the peace while he
>           removed his family and personal possessions.

Id. at 1029-30 (emphasis added).  In light of the community
caretaker basis for entry, the court held irrelevant whether the
guest had the authority to give valid consent for an entry and
search of the premises.  Id. at 1030.

Here, Heather Burton had a right to remove her belongings
when her status as defendant's live-in nanny ended.  Defendant
showed signs of hostility and belligerence, and Officer Mras was
aware of defendant's past violent tendencies.  Therefore, it was
reasonable for Burton to ask the officers to accompany her to
keep the peace while she removed her belongings.  Before
entering, the officers confirmed that Burton had been defendant's
employee and explained to defendant the reason for their entry,
and the evidence shows that the officers' sole purpose in
entering defendant's home was to assist Burton.  The trial court
expressly found that the entry was not pretextual.  We hold,
therefore, that the community caretaker doctrine permitted the
officers' entry of defendant's home for the limited and
objectively reasonable purpose of helping Burton remove her
belongings.

### Independent Source

We further hold that Heather Burton's discovery of the
marijuana in the upstairs attic closet did not come about because
of "exploitation" of the alleged illegal entry.  Defendant

conceded on oral argument that the police officers did not violate his rights by standing on his front porch and asking his permission for entry. It was at this time that defendant consented to Burton's entry, and the record contains no evidence that defendant's consent for Burton's entry was involuntary or coerced.

Defendant argues that the marijuana should not be admitted as evidence because its discovery was "fruit of the poisonous tree," that is, of the alleged illegal entry of the premises by the police. The courts have recognized "three limitations to the 'fruit of the poisonous tree' doctrine, namely: (1) evidence attributed to an independent source; (2) evidence where the connection has become so attenuated as to dissipate the taint; and (3) evidence which inevitably would have been gained even without the unlawful action." Warlick v. Commonwealth, 215 Va. 263, 266, 208 S.E.2d 746, 748 (1974). Even if the police had remained on the porch as the defendant concedes they had the right to do, Burton, who had been given permission to enter the house, would have discovered the marijuana and confirmed to the police that marijuana was present in the house. Once inside the house, the officers appropriately confined their movements to the first floor of the residence. It was Burton, an independent source, who found defendant's marijuana plants in a second floor attic closet while retrieving her belongings.

## Seizure of the Marijuana

After confirming the basis for Burton's knowledge that the plants were marijuana, the police had probable cause for a search warrant and properly secured the scene while obtaining a warrant in order to prevent the destruction of evidence. See, e.g., Crosby v. Commonwealth, 6 Va. App. 193, 199, 367 S.E.2d 730, 734 (1988). They allowed defendant to move freely in and out of the house and around the first floor and remained on the first floor themselves until exigent circumstances required their immediate action. See Keeter v. Commonwealth, 222 Va. 134, 141, 278 S.E.2d 841, 846 (1981) (holding that "an exigent circumstance exists justifying [a warrantless] entry where the law enforcement officers have probable cause to believe that it is necessary to prevent the destruction of evidence"). Defendant barricaded himself in the garage without police opposition, but when the officers saw him dig a hole in the ceiling of the garage and saw his legs dangling from the hole, they properly concluded that he was attempting to reach the marijuana plants on the second floor in order to hide or destroy evidence. When they rushed to the second floor and found defendant in the attic closet trying frantically to hide the marijuana plants, they acted properly in preventing the further destruction of evidence until the search warrant arrived. See Crosby, 6 Va. App. at 199, 367 S.E.2d at 734.

Under these facts, we hold that the community caretaker doctrine permitted Burton's and the officers' initial entry into

the home, and on Burton's independent discovery, the officers had probable cause to seek a search warrant and to secure the home pending arrival of that warrant.  Finally, exigent circumstances permitted the officers to enter the second floor of the home and secure defendant and the marijuana pending the arrival of the search warrant.  As a result, we reverse the trial court's suppression of the evidence and remand for such further proceedings as the Commonwealth may be advised consistent with this opinion.

Reversed and remanded.
