# CIRCUIT COURT OF ALBEMARLE COUNTY

Commonwealth of Virginia

v.

Andrew Bishop

May 27, 1998

BY JUDGE PAUL M. PEATROSS, JR.

This matter comes before the Court on a Motion to Suppress filed by Defendant Andrew Bishop. Oral argument was heard on the motion on April 22, 1998, and the Court took the motion under advisement to consult the legal authority cited.

## Background

The facts showed that Ron Kesner, Albemarle County Police Officer, was called to the residence of 2058 Lakeside Drive in Albemarle County for a loud party complaint. Officer Kesner drove to the residence, and there was a loud party going on which included loud music which could be heard a great distance from the house. After driving up to the residence in the driveway approximately 150 to 200 yards, he noticed people on the deck and stereo speakers producing loud music. He remained in his car, and Mr. Bishop came to the window of his car. Officer Kesner explained the loud music call and advised Bishop that the noise ordinance went into effect a 11:00 p.m. and he may want to consider lowering the music in consideration of his neighbors. Mr. Kesner saw people on the deck but no one in the front yard.

Later that evening at 10:30 p.m., Officer Kesner was dispatched again to the residence with a complaint of intoxicating subjects wandering across neighbors' lawns. Upon returning, he stopped on the main road 25 yards before the driveway and could hear loud music and saw people on the front

deck. He further heard loud abusive language and called for backup. Officer Fink arrived as a backup. As Officer Fink and Officer Kesner were on the public road, an individual came down the driveway from the house, who appeared unsteady on his feet and was yelling back at persons at the residence. As he came into the state roadway, the individual had a cup in his hand. Mr. Kesner, in uniform, identified himself and smelled a strong odor of alcohol from the individual's breath. Officer Kesner asked for I.D., and the individual threw the cup and contents on the ground. He was arrested for littering, after which he was searched and no contraband was found.

Officer Kesner called for more units. At that point, a pickup truck came down the driveway from the residence in an erratic manner and came out onto the state road. Officer Kesner motioned this vehicle to stop and asked the driver to step out for a pat down of weapons. There was an odor of alcohol about the person, and Officer Kesner felt a hard object in the front pocket. He retrieved this object which turned out to be a smoking device which Officer Kesner said was typically used for marijuana smoking. Officer Kesner then searched the vehicle and found a weapon, a semi-automatic 9 mm. under the driver's seat, which was loaded and in a holster. There was a round chambered in the weapon with a full magazine in the handle. This individual, named Kelly Faust, was placed under arrest.

Thereafter, Officers Aylor and Hackney and Sergeants Perry and Blake arrived and were advised by Kesner and Fink of the arrest they had made.

Officer Kesner advised of the need to approach the residence to address the noise violation as it was after 11:00 p.m. at this point. There was still loud music and foul language emanating from the residence. Officer Kesner testified that the officers decided to approach the house to locate the owner. Based on the arrest, behavior, and concealed weapon, he felt it was unsafe to approach the residence without additional officers to back him up.

Officer Kesner testified that he went up the right side of the driveway with the purpose of locating a door to talk to someone about the noise ordinance. Upon arriving at the house, he was looking for the main door and all he saw were sliding glass doors, which he did not interpret to be a main door. Officer Hackney was behind him, and Officer Aylor was close by. Upon approaching what was to be the side of the house to which the paved driveway led, he went to his right when he came upon a grassy area to go around what was the rear of the house. He testified he was looking for a main door. As he did so, he looked in a window and noticed a subject walking through carrying a marijuana plant in one hand and a bong in the other. Smoke was emanating from the bong. As Officer Kesner continued to walk along the house, he saw

the subject open the door and come outside with the same objects in his hands. At that point, he arrested the subject for possession of marijuana, advised him of his rights, and gained information about the living arrangements of the individual apprehended. The individual advised that his name was O'Bryan and he rented the lower basement area of the apartments by oral lease. Mr. O'Bryan allowed Officer Kesner to search his room for more marijuana, and Officer Kesner searched O'Bryan's bedroom where he recovered pipes and seeds.

Officer Glen Fink confirms the account regarding the arrest of the two individuals at the driveway when he was with Officer Kesner. He testified that the group of officers had a discussion about approaching the house based on the party and the two arrests made, which included an intoxicated person who left with weapon in vehicle and in possession of drugs. It was decided to approach the residence without being seen. Upon reaching the residence by foot, he went up the steps to the deck off of the main level of the house. When he reached the front portion of the deck, he met the defendant, Andrew Bishop. He could see people inside the door from the deck and could also see into the kitchen area of the main level where people were milling around, talking, and drinking. He could still hear music, but the noise had decreased in volume. Officer Fink told Mr. Bishop why he was there, i.e., noise complaint and had arrested people leaving his residence. Officer Fink asked Mr. Bishop for permission to search, and Mr. Bishop did not deny or grant that permission. Instead, Mr. Bishop asked about consequences of the search, and Officer Fink asked whether he wanted to speak to Sergeant Perry, who was on the scene. Officer Fink and Mr. Bishop moved around the deck to a kitchen door where Sergeant Perry was talking to people at a kitchen door, which was a standard hinge door. After waiting 15 to 30 seconds to talk, Officer Fink saw Sergeant Perry go into the house to the living room area and start talking to someone in the interior of the house. There were approximately eight people in the kitchen area and two to three people in the living room area. After approximately another 20 to 30 seconds, Sergeant Perry motioned Officer Fink to come in to the living room area, and Sergeant Perry pointed to an ashtray which contained marijuana seeds, a piece of a plant stem, and a pipe screen laying next to the ashtray. Officer Fink announced to everyone present that he was going to get a search warrant from the residence and everyone had to file out, single file, and be patted down for drugs or firearms.

Before leaving the scene, Officer Fink became aware that Officer Kesner had arrested someone leaving the house and that Officer Aylor had also made an arrest. Officer Fink was also aware that Officer Kesner had searched the

lower part of the residence. Thereafter, Officer Fink left and returned to the residence with a search warrant which he served on Mr. Bishop.

Sergeant Sharn Perry arrived at the residence as a backup officer between 10:30 p.m. and 11:00 p.m. He met Officers Fink, Kesner, Aylor, Hackney, Blake, and Jenkins on the main road near the driveway. He was told that at least one person had been detained as he was leaving the residence and was also told that there was a party going on involving drugs. Sergeant Perry testified that the idea was to surround the house and investigate the extent of drug activity at the residence. In his words, the plan was to surround, contain, and have an officer go to the door to knock to investigate the extent of drug activity at the residence.

Sergeant Perry described his path of reaching the house and arriving at a sliding glass door underneath the deck. He saw Officer Jenkins talking to someone through that door. He also heard that one to two people had been placed under arrest almost immediately. He saw Officer Aylor on the steps leading to the deck but did not know why anyone had been arrested. He came to a door on the deck of the main level, which was the kitchen door, and noticed people inside. He may have pushed this door open. As he was standing in the doorway, he noticed approximately four people, all of whom said they were guests and not the owner. He could see beyond the kitchen into the living room area where he saw approximately six people. When he got to the kitchen door, he knew people had been arrested for possession of drugs. Also, he noticed, while standing in the doorway, a divider wall which blocked a portion of the living room area. The people were milling around and drinking, and at this point, he entered into the interior of the house to observe what was behind the partition. He said the basis for doing so was that he knew a person had been arrested near the entrance to the driveway, who had a weapon, and that he also wanted to keep people calm. Sergeant Perry positioned himself where he could see behind the partition and noticed an ashtray on a low table that appeared to have marijuana residue, based on his training and experience. At this point, he motioned to Officer Frank, who was outside on the deck, to come in and observe the ashtray.

### Question Presented

Was the warrantless entry by Sergeant Perry into the interior of the residence to do a search for persons to maintain safety in violation of the Defendant's Fourth Amendment rights?

*Discussion of Authority*

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their ... houses ... against unreasonable searches and seizures shall not be violated." U.S. Const., Amend. IV. "Searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* at 590.

Defendant has argued that the "entrance to the house" language of *Payton* refers specifically to the front door or main entrance to a dwelling and that Officer Kesner, Officer Hackney, and Sergeant Perry violated defendant's Fourth Amendment rights by going to the rear of the home where one would not expect a member of the public to go in search of a main door where there was no lighting or logical path. However, the Court does not believe that Mr. Bishop maintained an expectation of privacy in this outside area since he rented out the basement area of the house to two tenants, Mr. Childress and Mr. O'Bryan. *See Katz v. United States,* 389 U.S. 347 (1967).

Sergeant Perry's warrantless entry into the interior of the residence is a more delicate matter since "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States Dist. Court, Eastern Dist. of Michigan*, 407 U.S. 297, 313 (1972). Indeed, the Virginia Supreme Court has stated that "warrantless entries into dwellings, followed by searches, seizures, and arrests therein ... are presumed to be unreasonable, in Fourth Amendment terms, casting upon the police a heavy burden of proving justification by exigent circumstances." *Verez v. Commonwealth*, 230 Va. 405, 410 (1985) *cert. denied* 479 U.S. 813 (1986).

In *Verez*, the Court lists ten examples of exigent circumstances which might justify a warrantless entry:

(1) the degree of urgency involved and the time requirement to get a warrant; (2) the officer's reasonable belief that contraband is about to be removed or destroyed; (3) the possibility of danger to others, including police officers left to guard the site; (4) information that the possessors of the contraband are aware that the police may be on their trail; (5) whether the offense is serious, or involves violence; (6) whether officers reasonably believe the suspects are armed; (7) whether

there is, at the time of entry, a clear showing of probable cause; (8) whether the officers have strong reason to believe the suspects are actually present in the premises; (9) the likelihood of escape if the suspects are not swiftly apprehended; and (10) the suspects' recent entry into the premises after hot pursuit.

*Id.* at 410-11 (citations omitted). Clearly, the underlying rationale for the exigent circumstances exception to the warrant requirement is the need for immediate action and the impracticality of obtaining a warrant. Urgency is the unifying theme of other cases in which exigent circumstances have been found. *See, e.g., Lowe v. Commonwealth*, 218 Va. 670 (1977), *cert. denied*, 435 U.S. 930 (1978) (police knowledge of armed and violent criminals in a house justified a warrantless entry in order to assure their swift apprehension in the interest of the safety of the community and the police); *Wright v. Commonwealth*, 222 Va. 188 (1981) ("where there are exigent circumstances in which police action literally must be 'now or never' to preserve the evidence of the crime, it is reasonable to permit action without prior judicial evaluation.") (quoting *Roaden v. Kentucky*, 413 U.S. 496, 505 (1973); *Keeter v. Commonwealth*, 222 Va. 134, 142 (1981) (potential discovery during a controlled purchase of marijuana meant "the officers had probable cause to believe that it was necessary to make the warrantless entry to prevent the destruction of evidence.")

By contrast, in *Walls v. Commonwealth*, 2 Va. App. 639, 648 (1986), the court held that police entry of a trailer following a peaceful arrest violated the Fourth Amendment since the officer "pointed to no specific facts from which he could reasonably have concluded that either he or anyone else was in danger." The court continued:

there was nothing inherently dangerous in this situation. [Defendant's girlfriend in the trailer] and her children were not suspected of criminal activity, nor was there reason to believe that they were armed and dangerous. In addition, the crime being investigated was a non-violent one, and unlike *Keeter*, there was no concern of interference by accomplices.

While there is an exception to the warrant requirement allowing police officers to enter a building in response to a dangerous situation or an emergency, the scope of this exception is not so broad as to encompass the innocuous situation presented here.

*Id.* at 648-49.

In the case at bar, the facts fall short of establishing exigent circumstances. No evidence was offered of an emergency situation necessitating immediate action on the part of the police. This is not a case of hot pursuit. The police demonstrated no urgency in their approach to the house and articulated no reasonable belief that contraband was about to be removed or destroyed. Since the house was surrounded by six officers, concern of escape due to lack of swift apprehension seems unlikely. The offense suspected did not involve violence nor was evidence offered to suggest a reasonable belief that the people in the house were armed and dangerous.

However, the Commonwealth cites two lines of authority permitting warrantless entry for specific limited purposes under a less stringent standard than the traditional exception based on exigent circumstances. In *Crosby v. Commonwealth*, 6 Va. App. 193, 202 (1988), the court announced a three-pronged test for allowing warrantless entry in order to "secure the premises" by performing a "limited security check in those areas where individuals could hide." Such an entry requires that:

(1) police officers have probable cause to believe evidence is on the premises;

(2) delaying entry would create a substantial risk that evidence will be lost or destroyed or the critical nature of the circumstances prevents the use of any warrant procedure; and

(3) the police must not be responsible for creating their own exigencies.

*Id.* at 201 (footnotes omitted). The court in *Crosby* does not elaborate on what might qualify under the "critical nature of the circumstances" language above,[1] except to mention "a threat to police safety." *Id.* at 202. "To determine whether a warrantless entry for the limited purpose of securing the premises is reasonable, we must balance the law enforcement need to preserve evidence and protect its officers against the individual's privacy interest in maintaining the sanctity of the home."*Id.* at 200.

The court in *Crosby* relies on *Segura v. United States*, 468 U.S. 796, 798 (1984), in which the United States Supreme Court, in a 5 to 4 decision, held:

---

[1] The two cases it cites in a footnote, *United States v. Cuaron*, 700 F.2d 582 (10th Cir. 1983), and *United States v. Hackett*, 602 F.2d 1179 (9th Cir. 1980), involve urgency in securing the evidence and urgency in catching a suspect in the guilty act, respectively.

[W]here officers, having probable cause, enter premises … and secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures.

In *Crosby*, detectives received information from a reliable informant that defendant was selling Preludin, a Schedule II controlled substance out of his apartment. The detective encountered the defendant on the street near his residence, advised him that he intended to get a search warrant for the premises, and that to prevent destruction of the evidence at the apartment, the defendant would be detained until a search warrant could be obtained. When the detective asked if anyone else was in the apartment, the defendant would not answer. The detective asked for the key, and the defendant gave it to him, after which the detective went to determine whether anyone was there who would destroy the evidence. The Court upheld the entry to secure the premises because the detective "reasonably believed, under the totality of the circumstances, that delaying entry to secure a warrant would create a substantial risk that evidence would be lost or destroyed." 6 Va. App. at 202.

In the case at bar, unlike in *Segura* and *Crosby*, the officers were not in the process of obtaining a warrant when Sergeant Perry decided to enter the premises but only announced their intent to obtain a warrant after observing the ashtray with marijuana from inside the house. Furthermore, to the extent that the *Crosby* test retains a requirement of some urgency in its concern that "delaying entry" be the cause of the "substantial risk" to the evidence or that the "critical nature of the circumstances prevents the use of any warrant procedure," *Id.* at 201, the Commonwealth has not met its burden in showing any urgency which would have prevented the use of proper warrant procedure.

Sergeant Perry testified that "the plan was to surround, contain, and have an officer go to the door to knock to investigate the extent of drug activity at the residence." Although Sergeant Perry was aware by the time he reached the kitchen door that two arrests for drug possession had taken place outside, there was no indication that these had been other than peaceful arrests or that there were other weapons involved. Sergeant Perry did not indicate any belligerence on the part of the guests he spoke with through the kitchen door before entry or that any specific activity gave him cause for concern for his safety. As Sergeant Perry knew from his approach to the house, the front wall of the house is made of glass, meaning that, at least with regards to the portion of the house that Sergeant Perry entered, a *Crosby*-type "limited security

check in those areas where individuals could hide" could presumptively have been accomplished by observation from outside and did not necessitate entry. In the absence of some need for immediate action, even if there existed probable cause to believe evidence was on the premises, Sergeant Perry could have called the guests out and need not have entered without a warrant or permission.

The second line of authority which the Commonwealth cites is *Maryland v. Buie*, 494 U.S. 325, 337 (1990), which held that "[t]he Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie* is based on two strands of Fourth Amendment analysis: the "stop-and-frisk" rationale of *Terry v. Ohio*, 392 U.S. 1 (1968), and *Michigan v. Long*, 463 U.S. 1032 (1983); and the "search incident to arrest" doctrine of *Chimel v. California*, 395 U.S. 752 (1969).

Essentially, *Buie* permits an exception to the probable cause standard in certain narrow circumstances. First, the protective sweep must be in conjunction with an in-home arrest. In *Vale v. Louisiana*, 399 U.S. 30, 33-34 (1970), the Court explained:

> If a search of a house is to be upheld as incident to an arrest, that arrest must take place *inside* the house, *cf.*, *Agnello v. United States*, 269 U.S. 20 (1925), not somewhere outside — whether two blocks away, *James v. Louisiana*, 382 U.S. 36 (1965), twenty feet away, *Shipley v. California*, [395 U.S. 818 (1969)], or on the sidewalk near the front steps.

In *Buie* itself, the Court reasoned:

> Buie suggests that because the police could have sought a warrant to search for dangerous persons in the house, they were constitutionally required to do so. But the arrest warrant gave the police every right to enter the home to search for Buie. Once inside, the potential for danger justified a standard of less than probable cause for conducting a limited protective sweep.

494 U.S. at 344, n. 1.

In the case at bar, no arrest warrant gave the police the right to enter defendant's home. Therefore, the provision that "once inside, the potential for danger justified a standard of less than probable cause for conducting a limited protective sweep," does not apply. Neither do the two arrests outside the residence provide grounds for a "search incident to arrest" under *Chimel* and *Vale*. But even if a *Buie* exception for a protective sweep were available, the Commonwealth has not shown that circumstances were such as to provide Sergeant Perry with "a reasonable belief based on specific and articulable facts" that the area of behind the partition, which was exposed to the deck on which Officer Fink and Defendant stood, "harbor[ed] an individual posing a danger to those on the arrest scene."*See Id.* at 337.

Sergeant Perry said his basis for entering to look behind the partition was that he knew a person had been arrested near the entrance to the driveway, who had a 9 mm. weapon holstered under the seat of his truck and that he wanted to keep people calm. Assuming *arguendo* that an exception akin to *Buie* should apply, such testimony does not rise to the reasonable and individualized suspicion required. As noted in *Buie*: "Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted. That approach is applied to the protective sweep of a house." *Id.* at 344, n. 2.

As a final matter, the Commonwealth argues that should the Court find that either the pipes recovered in the search of the basement leasehold or the seeds found on the table in the main floor living room were obtained without just cause, but not both, then the Court may excise that information from the affidavit and find that there remained adequate independent probable cause to justify the issuance of the search warrant. *Neustadter v. Commonwealth*, 12 Va. App. 273, *aff'd en banc*, 13 Va. App. 283 (1991). In determining probable cause, only information contained in the affidavit can be considered. *Whitley v. Warden*, 401 U.S. 560 (1971). Officer Fink's affidavit for the search warrant reads:

> While answering a complaint of loud music and intoxicated persons on Lake Albemarle Road near the boat ramp, Kelly Faust was arrested for possession of marijuana and a concealed weapon as he left 2058 Lake Albemarle Road. Upon approaching the residence, Officer T. Aylor arrested Charles Lewis, who was found in possession of marijuana as he fled the residence. Officer Kesner also found two other pipes in the basement. While Sergeant Perry was speaking to a person in the living

room, he called me over and I observed marijuana seeds and a stem in an ashtray on the table. A one-inch metal screen was also on the table which is consistent with the ones used in smoking devices, based on my experience.

For the reasons stated above, the Court has found that the Commonwealth has not carried its burden of justifying Sergeant Perry's warrantless entry. Therefore, that information would be excised. As seen in the fact that the search warrant was sought only for the main and upper level, Officer Fink was aware at the time he sought the warrant that the basement level was leased out to tenants. Therefore, the information related to the pipes found in the basement would be excised as having no bearing on the upper level. As noted in *Neustadter*, "[b]y reporting less than the total story, an affiant can manipulate the inferences a magistrate can draw. To allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning." *Id.* at 282 (Judge Benton, dissenting) (*quoting United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985)). Since it is not clear from the affidavit whether Charles Lewis "fled" from the main level or lower level or that Kelly Faust had any connection to the upper level, this information is also suspect. After such excision, the Court does not find that adequate independent probable cause existed to justify the issuance of the search warrant for the upper levels of the home as sought. Seizure pursuant to a valid warrant may be deemed independent of a warrantless entry where the warrant was in the process of issuance before entry. *Keeter*, 222 Va. at 140. However, in the case at bar, the warrant was not in the process of issuance but was itself sought only after Officer Fink entered and observed the ashtray in the living room. Thus, the entirety of the after-acquired evidence should be suppressed as "fruits of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963).

The Motion to Suppress the evidence seized is granted.